UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT RAYMOND,<br>    Plaintiff, | :<br>:<br>: |
| v. | : CIVIL ACTION NO.<br>: 3:06-cv-1362 (VLB) |
| BOEHRINGER INGELHEIM<br>PHARMACEUTICALS, INC.,<br>    Defendant. | :<br>:<br>: August 27, 2009 |

## MEMORANDUM OF DECISION AND ORDER

This case was tried to the court from January 7, 2009 until January 12, 2009. The plaintiff, Dr. Robert Raymond, brought this action against the defendant, Boehringer Ingelheim Pharmaceuticals, Inc. (BIPI) alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA") and Connecticut Fair Employment Practices Act ("CFEPA") Conn. Gen. Stat. §46a-60 et seq. For the reasons hereinafter stated, the Court finds that BIPI has not proven that for the year prior to his termination, Raymond was a bona-fide executive or high policy maker, the exception to discriminatory termination under the ADEA. Accordingly, judgment is hereby entered for the plaintiff.

Facts

The Court finds the following facts. Raymond was born on October 29, 1939. He is a lawyer with a Ph.D. in organic chemistry who practiced intellectual property law, concentrating on pharmaceutical patents. BIPI terminated Raymond on October 31, 2004. BIPI is a pharmaceutical company with a center of operations in Ridgefield, Connecticut, and is one of several subsidiaries of a German parent

1

company. The management of BIPI and its sibling companies is centralized in Germany. BIPI hired Raymond as its chief patent counsel, effective October 31, 1994, two days after his fifty-fifth birthday.

As BIPI's chief patent counsel, Raymond originally oversaw BIPI's entire patent law group and reported directly to BIPI's general counsel, Ursula Bartels. The patent law group took the lead on securing patents for BIPI inventions and directing legal initiatives to protect those patents from infringement. Raymond advised other affiliates of BIPI's German parent on patent law. He directed and collaborated with outside counsel on patent matters, though there was no evidence that he had any role in retaining outside counsel. BIPI had a management committee that made policy decisions affecting BIPI specifically. Raymond attended meetings of this committee only twice, each time at Bartels' request. In around 2000, Raymond began reporting informally to the German parent's patent head.

On October 1, 2002, the month of his sixty-third birthday, BIPI promoted Raymond to Vice President Intellectual Property. The promotion did not increase Raymond's duties or responsibilities. The promotion proposal submitted to the German parent's board of directors for approval stated that the chief patent counsel's workload had increased significantly in recent years, and the title of vice president would be commensurate with the position's duties and necessary for BIPI's succession plans. According to the proposal, "it is expected that Dr. Raymond would hold this title until his retirement in two years time. Prior to that time, our succession plan calls for recruitment of an external candidate for this position. Preliminary research indicates that, to be competitive, a vice president title will be

**2**

required."  [Doc. #40, Ex. 3]

In early 2003, Raymond was asked to assist BIPI's search for his potential successor as vice president and chief patent counsel.  On August 29, 2003, BIPI hired Michael Morris as an attorney in the patent group.  Morris gradually usurped Raymond's professional and managerial duties; Raymond's direct reports began reporting to Morris. By December 2003, Morris no longer reported to Raymond but directly to Bartels. In an April 12, 2004, email, Bartels referred to Morris as the "de facto head of the department."  [Doc. #40, Ex. 6] The evidence introduced at trial showed that Raymond effectively ceased to manage other lawyers during 2004. Morris made all hiring decisions in 2004.

In 2004, Raymond's area of focus was patent litigation for BIPI and related companies. The details of Raymond's involvement in the litigation remain murky; however, he spent the majority of his time monitoring, consulting on, and attending a trial in which a BIPI sibling company was the plaintiff. He entered an appearance <u>pro hac vice</u> in one case, an unusual step for a patent prosecutor, but there was no testimony elicited that would show that Raymond was making major strategic decisions in the case, such as whether or for what amount to settle the case.

In September 22, 2004, Raymond met with David Nurnberger, vice president human resources, to discuss his retirement.  At that meeting, Nurnberger informed Raymond that BIPI had a mandatory retirement policy for executives upon reaching the age of sixty-five.

Following the meeting, Raymond told Nurnberger that he believed that the

3

company's age based retirement policy was illegal and provided copies of a court decision analyzing what Raymond believes to be a similar mandatory retirement policy for executives, <u>Whittlesey v. Union Carbide Corp.</u>, 567 F. Supp. 1320 (S.D.N.Y. 1983). He checked BIPI's policy database and found no mandatory retirement policy, because the mandatory retirement policy had not yet been published at the time. On September 28, 2004, despite Raymond's objections based on the <u>Whittlesey</u> case, Nurnberger sent Raymond a letter confirming that as his sixty fifth birthday occurred in October 2004, Raymond's retirement would become effective October 31, 2004. [Doc. #34-1, Ex. 4] Raymond continued his objection to the mandatory retirement policy throughout October 2004. On October 29, 2004, Raymond turned sixty-five. On October 31, 2004, he complied with BIPI's policy, retired, and began collecting pension benefits. On November 1, 2004, Morris succeeded Raymond as vice president intellectual property and chief patent counsel.

After this termination, Raymond spoke to one headhunter in search of employment. He attended two patent law events at which he passed out business cards promoting himself as a potential consultant or expert, and sent his resume to about a dozen major law firms with large intellectual property departments. As a result of his termination, his income declined precipitously in the year after termination. Eventually, Raymond increased his income by working as an expert witness.

On August 31, 2006, Raymond initiated this lawsuit by filing a complaint claiming that BIPI's enforcement of its mandatory retirement policy: 1) violated the

4

ADEA; 2) constituted a willful violation of the ADEA; 3) breached Raymond's employment contract; and 4) violated CFEPA. [Doc. #1] On December 27, 2007, BIPI moved for summary judgment on all counts. [Doc. #31] On December 31, 2007, Raymond filed a cross-motion for summary judgment on all counts. [Doc. 37] On August 21, 2008, the Court denied Raymond's motion for summary judgment and granted BIPI's motion for summary judgment as to counts 2 and 3 of his complaint and denied it in all other respects. <u>Raymond v. Boehringer Ingleheim Pharmaceuticals, Inc.</u>, 578 F. Supp. 2d 391 (D. Conn. 2008). In their joint trial memorandum, the parties stipulated that the sole contested issue of law and fact for trial was "whether Dr. Raymond's job as vice president and chief Patent Counsel was a 'high policymaking' and/or a 'bona fide executive' one as those terms are defined under state and federal age discrimination statutes." [Doc. #61]

<u>Discussion</u>

The parties agree as to the governing law and standards. The ADEA allows employers to mandate the retirement of their employees because of their age, provided those employees meet three criteria: (1) the employee is 65 or older, (2) the employee is entitled to collect a retirement benefit of at least $44,000 annually, and (3) the employee was employed in a "bona fide executive" or "high policymaking" position for the two years immediately prior to retirement. 29 U.S.C. § 631©; 29 C.F.R. § 1625.12 (2005); Conn. Gen. Stat. § 46a-60(b)(1). The employer bears the burden of establishing through clear and unmistakable proof that each element of the exception is met. 29 C.F.R. § 1625.12(b) The exception must be construed narrowly. <u>Air Line Pilots Ass'n v. Trans World Airlines</u>, 713 F.2d 940, 954 (2d Cir.

1983), reversed in part on other grounds by Trans World Airlines v. Thurston, 469 U.S. 111 (1985). The parties stipulated in their Joint Trial Memorandum that Raymond met the first two prongs of the exception. The parties also agree that Raymond's analogous state law claims should be analyzed under federal precedents.

      BIPI bore the burden of proof to show that Raymond was a bona fide executive or high policy maker at trial. It did not meet its burden. Even if Raymond had been a bona fide executive or high policymaker before Morris was hired, which is a close question, the Court finds that he unmistakably was not one for the two years prior to his retirement. Any of Raymond's job functions that could be described as executive or policymaking were assumed by Morris well before Raymond's retirement. "If the employee has held two or more positions in the two year period before retirement, the employee meets the exemption only if each position is either an executive or high policy-making position." Wendt v. New York Life Insurance Co., 94cv6132, 1998 WL 118168 at *4 (S.D.N.Y. March 16, 1998). Raymond was retired by BIPI of any policymaking and managerial duties and responsibilities before he reached his 65th birthday in favor of Morris. For the last year before Raymond retired, he had no ultimate hiring or firing authority, had no control over his cost center, was no longer very involved in patent prosecution or preparation, he no longer met with the research scientists, and had very few and superficial contacts with executives beyond Bartels.

      The crux of the high-policy-making exception is access to top decision makers when advocating policy. See Breckenridge v. Bristol-Myers Co., Civ. A.

No. EV 83-34-C., 1987 WL 15468 at * 8 (S.D.Ind., Feb. 16, 1987) (concluding general counsel was high policymaker because "he had direct access . . . to the president and other top officers of Mead Johnson, and that he was a member of a group or committee of Mead Johnson officers known informally as the 'President's Staff' and attended and participated in the weekly meetings of that group.") Raymond, and then Morris, reported no higher than the general counsel. The position was not one of great corporate influence. BIPI introduced evidence that showed the importance of obtaining patents to the corporation's core mission, but it is the type of function that the employee performs, and not the importance of that function, that is the test to determine whether an employee is a high policymaker. See Kiser v. Naperville Community Unit, 227 F. Supp. 2d 954, 962 (N.D.Ill., 2002) ("if [plaintiff] was primarily an attorney doing legal work and not policymaking, he should not fall into the policymaking exemption.") Like the chief labor counsel in Whittlesey, Raymond's contacts with executives were "for the purpose of furnishing legal advice." 567 F. Supp. at 1324. Cf. Morrissey v. The Boston Five Cents Savings Bank, 866 F. Supp 643 (D. Mass. 1994) (concluding that plaintiff was a high policymaker, as he "had direct access to the top decision makers, he was responsible for evaluating significant legislative and regulatory trends and issues and working with legislators on these issues, and he recommended policy on acquisitions and mergers, capitalization, and other areas of importance to the [defendant].") As the evidence showed that any of Raymond's authority to make important decisions or recommendations was

7

given to Morris in the year before his retirement, the Court concludes that Raymond was not a high policymaker at the time of his forced retirement.

To prove that Raymond was a bona-fide executive, BIPI had to show that Raymond was one of "a very few top level employees who exercise[d] substantial executive authority over a significant number of employees and a large volume of business." 29 CFR §1625.12 (d)(2). The evidence showed that, like the plaintiff in Whittlesey, Raymond did not by the end of his term at BIPI "exert a particularly strong influence over decisions on hiring, promotion, or salary." Whittlesey. 567 F. Supp. at 1323. He supervised only one employee and had minimal input on hiring in the department he had titular responsibility for. Therefore, the Court finds that Raymond was not a bona fide executive. As BIPI failed to present "clear and unmistakable" evidence of eligibility for either exception, the Court determines liability in favor of Raymond and turns to the assessment of damages.

Damages

Raymond argues that he is entitled to back pay (including benefits, bonuses, and regular raises) until the time of judgment, pre-judgment interest, and front pay until 2011.  BIPI pleaded the affirmative defense of failure to mitigate damages. BIPI further argues that front pay was inappropriate because Raymond would not have worked beyond 2006. At trial, Raymond offered no evidence that he would have worked beyond 2006 beyond his ipse dixit. He was unconvincing when he asserted that Audrey McRedmond, the benefits specialist, would not run retirement calculations beyond 2006. Instead, the Court finds that Raymond expected to retire within two years at the most. Raymond never told any

other person that he would work until 2011. Raymond was winding down his practice at BIPI. He sold his house in Connecticut, downsized to a condominium, purchased a residence in Florida, far from all of his professional contacts, and did eventually move there. Therefore, the Court finds that back pay is only appropriate until November 1, 2006, two years after Raymond's forced retirement, and front pay or reinstatement is inappropriate in this case. Back pay includes those benefits and bonuses which would have naturally accrued to him had he continued working for BIPI in his ultimate position until November 2006.

      The Court must next address the issue of mitigation. While neither party briefed the issue, BIPI pled mitigation as an affirmative defense and elicited testimony from Raymond at trial that tends to show that Raymond made minimal efforts to mitigate his damages. Raymond did not make a diligent effort to find substitute employment.  He testified that he sent business cards to a few people in the industry, and identified only eight or nine potential employers. He established an expert witness practice, but did not take meaningful steps to advance his practice as an expert witness until 2008. Despite Raymond's admittedly sterling credentials and long experience, this practice reaped few retainers and meager earnings. The employer "bears the burden of demonstrating that [the] plaintiff has failed to satisfy the duty to mitigate." Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005). "The rule [is] that a victim of employment discrimination has the same duty to mitigate his damages as any victim of a tort or breach of contract." Sands v. Runyon, 28 F.3d 1323 (2d

Cir. 1994) (internal quotation omitted). Despite the duty to mitigate, "the unemployed. . .need not go into another line of work, accept a demotion, or take a demeaning position." <u>Ford Motor Co. v. EEOC</u>, 458 U.S. 219, 231 (1982). "While it is the plaintiff's duty to mitigate, it is the defendant who has the evidentiary burden of demonstrating at trial that a plaintiff has failed to satisfy this duty. This may be done by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." <u>Dailey v. Societe Generale</u>, 108 F.3d 451, 456 (2d Cir. 1997).

> An assessment of the reasonableness of a plaintiff's effort to mitigate encompasses more than a simple review of the duration of his or her job search, or of the plaintiff's initial estimates as to how long a successful job search might take; instead, it entails a consideration of such factors as the individual characteristics of the claimant and the job market, as well as the quantity and quality of the particular measures undertaken by the plaintiff to obtain alternate work.

<u>Id</u>. "But an employee's 'obligation' to minimize her wage losses 'is not onerous and does not require her to be successful' in seeking a new job." <u>Serricchio v. Wachovia Securities, Inc.</u>, 606 F.Supp.2d 256, 262 (D. Conn. 2009), <u>quoting Hawkins v. 1115 Legal Serv. Care</u>, 163 F.3d 684, 695 (2d Cir. 1998). The "question is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment." <u>Pierce v. F.R. Tripler & Co.</u>, 955 F.2d 820, 830 (2d Cir. 1992). It was BIPI's burden to establish that Raymond did not mitigate his damages. BIPI presented, through cross-examination of Raymond, credible evidence that Raymond did not seriously seek to replace his income either by seeking employment or retainers as an expert witness.

>  The Second Circuit notes that:
>
>  [g]enerally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate. "This may be done by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47 (2d Cir.1998), however, establishes an exception to this general rule and holds that an employer "is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment.". . .The decision states that the underlying rationale for the exception it creates "is that an employer should not be saddled by a requirement that it show other suitable employment in fact existed the threat being that if it does not, the employee will be found to have mitigated his damages-when the employee, who is capable of finding replacement work, failed to pursue employment at all." These passages establish that the <u>Greenway</u> exception is an exception to the necessity of evidence of alternative employment, not an exception to the general burden borne by the employer."

<u>Broadnax v. City of New Haven,</u> 415 F.3d 265, 268-269 (2d Cir. 2005) (internal citations omitted). BIPI is not required to establish that suitable work existed because Raymond utterly failed to make a diligent effort to secure employment either in anticipation of or after his termination by BIPI.  Although the Court is aware that Raymond may have suffered some lost income as consequent to his termination, it would be speculative at best for the Court to quantify that loss on the record at hand. Accordingly, the Court awards no damages.

           IT IS SO ORDERED.

           _____/s/_____

           Vanessa L. Bryant
           United States District Judge

Dated at Hartford, Connecticut:  August 27, 2009.